UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

'08 CV 9808

|  |  |  |
|---|---|---|
| | x | |
| | : | |
| | : | Civil Action No. |
| AARON MAGEL, Individually and on | : | |
| Behalf of All Others Similarly Situated, | : | |
| | : | |
| Plaintiff, | : | CLASS ACTION |
| | : | |
| vs. | : | |
| | : | COMPLAINT FOR VIOLATIONS OF THE |
| | : | FEDERAL SECURITIES LAWS |
| ELAN CORPORATION, PLC, G. KELLY | : | |
| MARTIN and JAMES E. CALLAWAY, | : | |
| | : | DEMAND FOR JURY TRIAL |
| Defendants. | : | |
| | : | |
| | x | |

RECEIVED
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.      Plaintiff, Aaron Magel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Elan Corporation, plc, as well as media reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.      This is a securities class action on behalf of all persons or entities who acquired the American Depository Receipts ("ADRs") of Elan Corporation, plc ("Elan" or the "Company") between June 17, 2008 and July 29, 2008, inclusive (the "Class Period") seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

3.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Act and Rule 10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Elan conducts business in this District and its ADRs trade on the New York Stock Exchange ("NYSE"), which is located in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

.

## PARTIES

6.     Plaintiff Aaron Magel, as set forth in the accompanying certification, which is incorporated by reference herein, purchased ADRs of Elan at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Elan Corporation, plc is a neuroscience-based biotechnology company operating primarily in Ireland and the United States. It operates in two segments, Biopharmaceuticals and Elan Drug Technologies (EDT). The Biopharmaceuticals segment engages in research, development, and commercial activities primarily in Alzheimer's disease, and Parkinson's disease, multiple sclerosis, Crohn's disease, severe chronic pain, and infectious diseases.

8.     Defendant G. Kelly Martin ("Martin") has been a director, President and Chief Executive Officer ("CEO") of Elan since February 2003.  Martin was formerly president of the International Private Client Group and a member of the executive management and operating committee of Merrill Lynch & Co., Inc.

9.     Defendant James E. Callaway ("Callaway") has been the Senior Vice President, Head of Immunotherapy Alzheimer's Disease Clinical Programs since March 2004.  Callaway has held several senior positions since joining Elan in 1995, including Interim Head of Global Development and Vice President of Biopharmaceutical Development Services. Prior to Elan, Defendant Callaway worked at Bayer Pharmaceuticals.

10.     The Defendants referenced above in ¶¶ 8 and 9 are referred to herein as the "Individual Defendants."

11.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Elan, were privy to confidential and proprietary information concerning Elan, its operations and clinical programs.  Because of their positions, the Individual Defendants had access to material information available to them but not to the public. Each of the Individual Defendants knew that the adverse facts specified hereinafter had not been disclosed to and were

being concealed from the public and that affirmative representations by the Company specified hereinafter were materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as the statements were either made by a particular Individual Defendant or were "group-published" information, the result of the collective actions of the Individual Defendants.

12.     In addition to their direct participation in the wrongs complained of herein, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Elan's business.

13.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of the Company's press releases to the investing public. The Individual Defendants were provided with copies of the Company press release, prior to or shortly after its issuance, that, as more particularly alleged hereinafter, was misleading, and they had the ability and opportunity to prevent its issuance or cause it to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts hereinafter alleged.

14.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose ADRs are registered with the SEC pursuant to the Exchange Act, and are traded on the New York Stock Exchange and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Elan's clinical programs, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Elan's ADRs would be based upon truthful and accurate information. The Individual Defendants'

misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Elan's ADRs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Elan's clinical programs and thus the intrinsic value of Elan's ADRs and caused Plaintiff and members of the Class (defined below) to purchase Elan's ADRs at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired Elan ADRs during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Elan ADRs were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Elan or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Elan; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

21.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### BACKGROUND

22.     Bapineuzumab is a humanized monoclonal antibody co-developed by Elan and Wyeth that acts on the nervous system and has potential therapeutic value for the treatment of Alzheimer's disease.

23.     Specifically, Bapineuzumab is an antibody to beta-amyloid ("A$\beta$") plaques. A$\beta$ is a peptide of 39–43 amino acids that appear to be the main constituent of amyloid plaques in the brains of Alzheimer's disease patients.

24.     In clinical trials, Elan and Wyeth dosed patients with Bapineuzumab to bind to and clear the A$\beta$ peptide ("passive immunotherapy"), eliminating the need for a patient to mount their own individual immune response.

25.     A purported advantage of Bapineuzumab is that the treatment reduces or eliminates safety problems associated with therapies that stimulate an immune response ("active immunotherapy").

26.     On May 21, 2007, Elan and Wyeth announced their plans to initiate phase 3 clinical trials of Bapineuzumab. Significantly, phase 3 studies were launched prior to the conclusion of ongoing phase 2 studies. The decision to go forward was based, according to Elan and Wyeth, on the totality of the accumulated clinical data from phase 1, phase 2 and a 4.5- year follow-up study of those patients involved in Elan and Wyeth's AN-1792 trial.

27.     AN-1792 was active immunotherapy Alzheimer's treatment pursued by Elan and Wyeth. The AN-1792 trial was suspended due to serious adverse effects in which a subset of patients developed encephalitis, or brain inflammation.

## SUBSTANTIVE ALLEGATIONS

28.     The Class Period begins June 17, 2008 when Elan and Wyeth issued the following press release regarding the phase 2 trial of Bapineuzumab stating the following, in relevant part:

**Elan and Wyeth Announce Encouraging Top-line Results from Phase 2 Clinical Trial of Bapineuzumab for Alzheimer's Disease**

- *Safety And Efficacy Findings Support Design Of Phase 3 Program*
- Primary Efficacy Endpoints In Overall Study Population Not Statistically Significant
- *Statistically Significant And Clinically Meaningful Benefits Seen In ApoE4 Non-Carriers*
- *Overall Results Support Prior Decision To Initiate Phase 3*
- Detailed Data Presentation At ICAD July 29, 2008

*Elan Corporation, plc and Wyeth today announced encouraging preliminary findings from a Phase 2 study of bapineuzumab (AAB-001) in patients with mild to moderate Alzheimer's disease. In the 18-month trial, bapineuzumab appeared to have clinical activity in treating Alzheimer's disease.*

- 6 -

Efficacy Findings

The study did not attain statistical significance on the primary efficacy endpoints in the overall study population. *Post-hoc analyses did show statistically significant and clinically meaningful benefits in important subgroups.*

*In non-carriers of the Apolipoprotein E4 (ApoE4) allele, estimated in the literature to be from 40 to 70 percent of the Alzheimer's disease population, post-hoc analyses showed statistically significant and clinically meaningful benefits associated with bapineuzumab treatment on several key efficacy endpoints,* including the Alzheimer's Disease Assessment Scale (ADAS-cog), the Neuropsychological Test Battery (NTB), the Mini Mental State Examination (MMSE) and the Clinical Dementia Rating – Sum of Boxes (CDR-SB). A favorable directional change was seen on the Disability Assessment Scale for Dementia (DAD), although this was not statistically significant.

*Additionally in non-carriers, preliminary evaluation of MRI results showed less loss of brain volume among treated patients versus placebo patients, a finding that was statistically significant.* Smaller increases in ventricular volume were seen in treated patients compared to placebo patients, although this finding was not statistically significant. Progression of Alzheimer's disease is generally associated with loss in brain volume and increases in ventricular volume. Further, treatment-related benefits seen on MRI were correlated to the favorable clinical changes observed in non-carriers.

In similar post-hoc analyses of carriers of the ApoE4 allele, no clinical benefits or statistically significant effects were observed on efficacy endpoints or the brain volume endpoint. *However, favorable directional changes were observed on a number of endpoints. Preliminary analyses suggest possible increase of ventricular volume in treated patients versus placebo patients.* The clinical significance of this finding is currently unclear and analyses are ongoing.

Safety Findings

As expected given the nature of the population studied, adverse events were very common in both placebo and bapineuzumab-treated patients. In non-carriers, the number of patients experiencing serious adverse events was similar between placebo and bapineuzumab-treated patients. In carriers, serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients. *In addition, vasogenic edema was reported in the treated population with an increased frequency in carriers and at higher doses.* No cases were reported in placebo patients. In the ongoing Phase 3 studies, carriers of the ApoE4 allele are being treated with a lower dose to minimize the risk of vasogenic edema. *The Companies believe that the overall safety findings from this Phase 2 trial support their prior decision to move to Phase 3 studies.*

- 7 -

CEO Comments

"The preliminary analyses of the Phase 2 study are a continued validation of the amyloid approach to Alzheimer's disease and an important milestone in our companies' ongoing commitment to bring new treatment options to patients," said Kelly Martin, President and CEO of Elan.  ***These results clinically support our decision to move into Phase 3 last year.***"

*"We are encouraged by these findings.  We remain driven by science and focused on patients as we work to bring this treatment to those who desperately need new options," said Bernard Poussot, President and CEO, Wyeth. "We recognize there is a great deal of hard work left as we move from this phase of learning towards confirming the potential of bapineuzumab."*

Elan and Wyeth plan to continue all four studies in the previously disclosed bapineuzumab Phase 3 clinical program and will review and discuss these data with regulatory authorities and leading medical experts.

These findings reflect preliminary analyses of the Phase 2 data and its implications for ongoing clinical development of bapineuzumab.  In this trial, there were imbalances in patient numbers and characteristics at baseline between subgroups studied that may or may not have affected these results.  Further analysis will continue in advance of a planned scientific presentation of detailed results of this study at the International Conference on Alzheimer's Disease (ICAD) in Chicago, July 29, 2008.

About the Trial

The Phase 2 trial was a randomized, double-blind, placebo controlled, multiple ascending dose study of patients with mild to moderate Alzheimer's disease.  The study was designed to enroll approximately 240 participants at 29 sites in the United States.  The study tested four doses of bapineuzumab (0.15 mg/kg, 0.5 mg/kg, 1.0 mg/kg and 2.0 mg/kg) with approximately 60 patients in each dose cohort.  Patients were randomized on an 8:7 ratio to receive bapineuzumab or placebo, resulting in approximately 32 participants receiving bapineuzumab and 28 participants receiving placebo in each dose group.

The study assessed the safety of bapineuzumab as well as impact of treatment on cognitive and functional endpoints, biomarkers and blood serum levels.  The pre-specified primary efficacy endpoints were change from baseline in ADAS-cog and DAD in the 0.5 mg/kg, 1.0 mg/kg and 2.0 mg/kg dose groups against their placebo cohorts.  The study was not powered to detect changes from baseline for the ADAS-Cog or DAD scales.  Change in concentrations of tau in cerebral spinal fluid (CSF) was a secondary endpoint. The Neuropsychological Test Battery, Clinical Dementia Rating Sum of Boxes and Mini Mental State Examination (MMSE) were included as tertiary efficacy endpoints. Efficacy was assessed from baseline for 18 months.

(Emphasis added.)

29.     On the day of these announcements, the price of Elan ADRs rose from $27.11 to $30 in one day, or 10.7%, on extremely high volume.

30.     Over the following days, as Defendants' statements disseminated into the market, the share price continued to rise – on above-average volume – to the $35 range.

31.     Defendants' statements set forth above were materially false and misleading because Defendants failed to disclose the full, unfavorable results of the phase II clinical study of Bapineuzumab. Specifically, Defendants failed to disclose that the efficacy results of the study were not as strong as Defendants characterized them to be and that some of the patients taking Bapineuzumab suffered adverse events that might have been related to the drug that were not dose-dependent.

### THE TRUTH IS REVEALED

32.     On July 29, 2008, Elan and Wyeth issued a press release which stated as follows:

**Elan and Wyeth Present Encouraging Results from Phase 2 Clinical Trial of Bapineuzumab at International Conference on Alzheimer's Disease**

Overall Assessment:

- Safety and efficacy results support design of ongoing global Phase 3 program
- Vasogenic edema correlated with dose and ApoE4 carrier status which influenced the Phase 3 program design
- ***Pre-specified efficacy analysis did not reach significance in the total population***

In Post Hoc Analyses:

- Trends were observed in the cognitive endpoints ADAS-cog and NTB in the total population
- Statistically significant and clinically meaningful effects were observed in multiple endpoints in ApoE4 non-carriers
- In ApoE4 carriers, favorable directional changes were seen in some endpoints, warranting further study

Elan Corporation, plc and Wyeth today are presenting detailed results from the companies' 18-month Phase 2 study of bapineuzumab (AAB-001) in patients with mild to moderate Alzheimer's disease at the Alzheimer's Association's International Conference on Alzheimer's Disease 2008 in Chicago, Illinois. As previously announced, in the study, bapineuzumab appeared to have an acceptable safety profile and clinical activity in treating Alzheimer's disease. Potential efficacy signals were seen at a range of doses without a clear dose response. ***The study did not attain statistical significance on the pre-specified efficacy endpoints in the overall study population.*** Post-hoc analyses showed statistically significant and clinically meaningful benefits in important subgroups.

The data will be presented by Sid Gilman, M.D., William J. Herdman Distinguished University Professor of Neurology, Director of Michigan Alzheimer's Disease Research Center, University of Michigan, and Chair of the independent safety monitoring committee for bapineuzumab.

"This study was limited in its size, design and goals," said Dr. Gilman, "but if the findings seen in these post-hoc analyses are replicated in the global Phase 3 program, it would be a validation of the amyloid hypothesis and could change how physicians approach the treatment of Alzheimer's disease."

Elan and Wyeth believe that the safety and efficacy findings from this Phase 2 trial of bapineuzumab in patients with mild-to-moderate Alzheimer's disease support the design of the ongoing global Phase 3 program and plan to incorporate learnings from this study into the Phase 3 program. The companies will continue to work diligently to develop much needed new treatment options for patients and physicians.

About the Phase 2 Clinical Trial

The double-blind, placebo-controlled multiple ascending dose trial was designed to assess the safety and tolerability of bapineuzumab in mild-to-moderate Alzheimer's disease and to explore efficacy at a range of doses. Two-hundred-thirty-four (234) patients were randomized (1) to receive one of four doses of bapineuzumab (0.15 mg/kg [n=31], 0.5 mg/kg [n=33], 1.0 mg/kg [n=30] or 2.0 mg/kg [n=30]) or placebo [n=110] by intravenous infusion every 13 weeks. Findings were reported for 229 patients in a modified intent-to-treat (MITT) analysis. Patients were intended to receive up to six doses during the 18-month study.

The pre-specified primary efficacy endpoints were change from baseline in Alzheimer's Disease Assessment Scale-Cognitive Subscale (ADAS-cog) and Disability Assessment Scale for Dementia (DAD) in the 0.5 mg/kg, 1.0 mg/kg and 2.0 mg/kg dose groups against their placebo cohorts. Other efficacy measures included change in concentrations of tau in cerebral spinal fluid (CSF), the Neuropsychological Test Battery (NTB), the Clinical Dementia Rating Sum of Boxes (CDR-SOB), the Mini Mental State Examination (MMSE) and brain volume as measured by MRI. Efficacy was assessed from baseline for 78 weeks.

Pre-Specified Efficacy Analysis:

In the total study population, statistical significance was not obtained on the pre-specified efficacy endpoints of ADAS-cog and DAD.

Post-Hoc Efficacy Analyses:

Modified Intent to Treat (MITT) included patients who received at least one infusion and one efficacy assessment. In analyzing the data, the following were taken into account: an assumption of non linearity of the data over time, ApoE4 carrier status, and baseline MMSE and test scores.

The clinical relevance of the results for patients receiving the full 18 months of therapy was analyzed in a completer analysis. The patients included in the completer analysis received six (6) infusions and a week 78 efficacy assessment.

Using these assumptions, trends in favor of bapineuzumab treated patients were observed in ADAS-cog and NTB in the total MITT population. Additional completer analyses reinforced these trends.

The study revealed important differences in the rate of vasogenic edema by carrier status and for this reason the total population was analyzed by ApoE4 carrier status (2).

ApoE4 Non-Carrier Population

In the ApoE4 non-carrier patients, statistically significant differences from baseline to week 78 were observed in favor of bapineuzumab treated patients on both cognitive and functional efficacy endpoints:

· ADAS-cog treatment difference of 5.0; p=0.026

· NTB treatment difference of 0.35; p=0.006

· CDR-SB treatment difference of 1.5; p=0.040

A favorable directional change of 6.9, p>0.10 for DAD was observed.

The completer analysis for non-carrier patients was consistent with the above findings.

Additionally, in these non-carrier patients, MRI results showed significantly less brain volume reduction versus placebo, as measured by the Brain Boundary Shift Integral (BBSI), at 71 weeks (3) , with a treatment difference of 10.7 cc; p=0.004. Smaller increases in ventricular volume (VBSI) in bapineuzumab treated patients compared to placebo were observed, which were not statistically significant. Progression of Alzheimer's disease is generally associated with loss in brain volume and increases in ventricular volume.

ApoE4 Carrier Population

In the ApoE4 carrier patients, no statistically significant changes were observed in any of the cognitive or functional efficacy endpoints. The completer analysis for the carrier population showed favorable directional changes on cognitive and functional endpoints. The ongoing Phase 3 studies in ApoE4 carriers will help clarify these findings.

MRI findings in the carrier patients showed no significant change in brain volume between bapineuzumab treated and placebo patients, while a significant increase in ventricular volume in treated patients was observed, mean 2.5cc; p=0.037. The clinical relevance of this finding is still unclear and will continue to be evaluated.

"The clinically significant benefit seen with bapineuzumab treatment in the ApoE4 non-carrier subgroup is encouraging," said Dale Schenk, Ph.D., Executive Vice President and Chief Scientific Officer of Elan. "These results across multiple endpoints are consistent with what we have seen for beta amyloid immunotherapy from animal studies through to the patients."

"These data represent scientific validation of our decision to move rapidly into Phase 3 last year," said Gary L. Stiles, M.D., Chief Medical Officer, Wyeth. "In our Phase 3 program, we will learn much more since we will be able to study bapineuzumab in larger patient populations and better assess the results in ApoE4 carriers and non-carriers in separate trials. We are encouraged by these results and we'll achieve greater insight as we move forward."


Safety Findings

*Adverse Events (AE) were observed in 95% of bapineuzumab treated patients versus 90% of placebo treated patients. AEs were generally mild to moderate and transient. With the exception of vasogenic edema, AEs did not appear to be dose related.*

*Adverse events seen in greater than 5% of bapineuzumab treated patients and at twice the rate of placebo treated patients were: back pain; anxiety; vomiting; vasogenic edema; hypertension; weight loss; paranoia; skin laceration; gait disturbance; and muscle spasm.*

*Three deaths occurred in bapineuzumab-treated patients, though these were not considered by the investigators to be treatment related. No deaths were reported in the placebo group. Other adverse events of interest occurring in less than five percent of patients treated with bapineuzumab included cataract, deep vein thrombosis, syncope, seizures and pulmonary embolism.*


Vasogenic Edema (VE)

*Twelve (12) cases of vasogenic edema were reported, all in treated patients, and all resolved over time.* Ten (10) of these cases were reported in ApoE4 carriers with 2 cases in ApoE4 non-carriers. Eight (8) of the 12 cases were reported in the

highest dose group, including both cases seen in ApoE4 non-carriers.  Six (6) of
the 12 cases were not associated with clinical symptoms and were detected on
routine MRI scan.  One (1) patient was treated with steroids.  Re-dosing was
instituted in six (6) of the 12 patients and no recurrence of VE was observed.

Phase 3 Program Implications

The Phase 2 data reinforce the design of the ongoing Phase 3 studies by ApoE4
carrier and non-carrier populations and the selected dose groups.  The companies
plan to continue all four ongoing Phase 3 studies.  The ApoE4 carrier dose in the
Phase 3 trials was selected to seek to minimize the risk of VE observed in the
Phase 2 trial.  The companies intend to obtain feedback from regulatory
authorities in the coming months to finalize parameters for the Phase 3 program
and discuss and reach agreement on requirements for registration.

(Emphasis added)

33.    As a result of these disclosures, the price of Elan ADRs plunged from $33.75 to

$19.63 in one day, a 42% decline, as artificial inflation came out of the price, on volume of over

80,000 million shares.

34.    The detailed findings revealed that only the patients lacking the APOE4 mutation

showed a slower decline in brain functions with Bapineuzumab treatment.  Only about one-third

of Alzheimer's patients lack the APOE4 mutation. Furthermore, the trial showed only a 5 point

effect on the standard survey scale (ADAS-COG) (existing Alzheimer's drugs show around a 3

point effect in comparison).

35.    In addition, the drug showed little or no benefit (and more side effects) in the

two-thirds of the patients who have the APOE4 mutations, which meant that when all patients in

the trial were taken together, improvement over placebo didn't reach significance. Since the trial

wasn't designed to distinguish between those different patient groups, that's the only number that

carried any significance.

36.    In sum, the detailed results revealed that the prior claims of "statistically

significant and clinically meaningful benefits" were based on 48 patients in four dose groups

who were treated with the drug who did not carry APOE4. Additionally, some patients had

results that were worse than placebo with respect to some of the measures of cognition and function. Moreover, efficacy did not increase with the dose. Thus, the detailed release revealed that the clinical results could have been random, rather than drug-related.

## LOSS CAUSATION/ECONOMIC LOSS

37.     By misrepresenting the Bapineuzumab clinical data, the Defendants presented a misleading picture of Elan's prospects. Thus, instead of truthfully disclosing during the Class Period the insignificant efficacy of Bapineuzumab, Defendants misrepresented Elan's financial outlook and its actual business prospects going forward.

38.     Defendants' misrepresentations caused and maintained the artificial inflation in the price of Elan ADRs throughout the Class Period and until the truth was revealed to the market.

39.     Defendants' false and misleading statements had the intended effect and caused Elan ADRs to trade at artificially inflated levels throughout the Class Period, reaching as high as $36.82 per share on July 10, 2008.

40.     As a direct result of public revelations regarding the truth about Bapineuzumab, Elan ADRs fell from $33.75 to $19.63 in one day, a 42% decline. This drop removed the inflation from Elan's ADR price, causing real economic loss to investors who had purchased Elan ADRs during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD ON THE MARKET DOCTRINE

41.     At all relevant times, the market for Elan ADRs was an efficient market for the following reasons, among others:

(a)     Elan ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market, as well as the London Stock Exchange and the Dublin Stock Exchange, which are also efficient markets;

(b)     as a regulated issuer, Elan filed periodic public reports with the SEC and the NYSE;

- 14 -

      (c)     Elan regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)     Elan was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

42.     As a result of the foregoing, the market for Elan ADRs promptly digested current information regarding Elan from all publicly available sources and reflected such information in the ADR prices. Under these circumstances, all purchasers of Elan ADRs during the Class Period suffered similar injury through their purchase of Elan ADRs at artificially inflated prices and a presumption of reliance applies.

<strong>NO SAFE HARBOR</strong>

43.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Elan who knew that those statements were false when made.

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Against the Company and the Individual Defendants**

44.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

45.     During the Class Period, the Company and the Individual Defendants disseminated or approved the false statements with deliberate disregard as to their accuracy, or which they knew were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     These Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Elan ADRs during the Class Period.

47.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Elan ADRs.  Plaintiff and the Class would not have purchased Elan ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II
### For Violation of §20(a) of the Exchange Act
### Against the Company and the Individual
### Defendants

48.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

49.     The Company and the Individual Defendants acted as controlling persons of Elan within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Elan ADRs, the Company and the Individual Defendants had the power and authority to cause Elan to engage in the wrongful conduct complained of herein. Elan controlled the Company, the Individual Defendants and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  November 12, 2008

SCOTT+SCOTT LLP

_____

DAVID R. SCOTT (DS 8053)
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415
P: 860-537-5537
F: 860-537-4432
drscott@scott-scott.com


ARTHUR L. SHINGLER III
HAL CUNNINGHAM
SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: 619-233-4565
Fax: 619-233-0508
ashingler@scott-scott.com
hcunningham@scott-scott.com

Attorneys for Plaintiff

## PLAINTIFF CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

_Aaron Magel_ , ("Plaintiff"), declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint and retains Scott + Scott, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction(s) in the **ELAN CORP. , PLC (ELN)** security that is the subject of this action during the Class Period is/are as follows:

| No of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 500 | Buy | 7/24/08 | $31.50 |

5.      During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this _27_ day of _October_ , 2008, at _Saint Johns, FL_ (city, state).

Your Printed Name: _Aaron Magel_

Signature: _Aaron Magel_

Mailing Address:

REDACTED

Telephone number:

E-mail address: